GOODWIN *v.* THE STATE, 4 Smedes and Marshall, 520.

### MURDER.

The record showed the following entry: "On the 3d day of April, 1844, the following entry was made on the minutes of the court, to wit: The grand jurors returned into court an indictment against William S. Goodwin, endorsed thereon a 'true bill;' Wm. M. C. Mirus, foreman of the grand jury, and returned to consider of further presentment. Said indictment is in the words and figures following, to wit:" Held, that these words show, with sufficient certainty, that an indictment was returned into court by the grand jury, and that the accused was indicted in due form.

Where the minutes of the court omit to state the character of the offense charged in the indictment, such omission forms no ground of error, if it be supplied by the other parts of the record. The rule is well settled that what is uncertain in any part of the record may be explained and rendered certain by reference to another part which is certain.

Where, it being in evidence that the deceased came to his death by means of the discharge, by the accused, of a shot gun loaded with duck shot, the court was asked to charge the jury, "That if they believed, from the evidence, that the deceased came to his death by means of the shot aforesaid, and not by one leaden bullet discharged from said shot gun, as alleged in the bill of indictment, they must find for the accused, and the court refused to give said charge, but did charge the jury, "That the said proof was sufficient to sustain the said bill as alleged in said indictment," the court properly refused to give said charge, and was clearly justified in the one which was given, as it referred solely to the proofs of the contents of the shot gun, and was not intended as a charge generally upon the evidence.

Error to the circuit court of Lowndes county.

The plaintiff in error was indicted by the grand jury of Lowndes county, at the April term, 1844, for the murder of Edmund N. Abbott. On the 14th February, 1844, a *venire facias* was issued by the clerk of the circuit court of Lowndes county, commanding the sheriff to summon, etc., and that on the first day of April term of said court, fourteen of the jurors summoned were drawn by lot and sworn as grand jurors. The

record states: " And afterwards, to wit, on the 3d day of April, 1844, the following entry was made upon the minutes of said court, to wit: The grand jurors returned into court an indictment against William S. Goodwin, endorsed thereon a true bill, Wm. M. C. Mirus, foreman of the grand jury, and returned to consider of further presentments.  The indictment is set out in full.  The prisoner was arraigned and plead not guilty, whereupon a special *venire facias* was issued to the sheriff, commanding him to summon fifty good and lawful men, etc., to serve as jurors on the trial of the prisoner.

The trial came on at the October term 1844.  Geo. M. Mullins testified on the part of the state, that he was at home about candle-light, on the evening of the 21st of March, 1844, when he heard the report of two fire-arms; he opened his door and heard Abbott, the deceased, setting his dogs on some one.  He went out, and saw some one get on a horse and go off at a rapid rate, the dogs following him, and a loose horse which ran off at the same time.  Went out and saw Abbott, the deceased, lying on the ground, on his face, about fourteen yards from the middle of the road, in an open lot on the north side of the road or street, with his left hand under him, and a revolving pistol, with five or six barrels, lying a little to his right and near his right hand, and two or three barrels of which had been discharged, the others being still loaded.  The reports of the fire-arms were not simultaneous, but several seconds apart.  Could not say which was the loudest sound, nor could the wife, with whom he immediately after conversed on the subject.  The lot where the deceased was found is immediately north of witness's house, on the Tuscaloosa road.  Deceased was wounded in the left side, just above the hip, and died in a very short time after witness reached him.  On next morning witness found upon the ground a ramrod, and the deceased's whip, lying near together; nearly opposite to each other to left of deceased, as he was lying when witness found him.  Deceased owned a large pack of dogs, twelve or fifteen, and used to run negroes with them; they were very fierce.  From the nature of the wound, deceased could not have gone from the road to the spot where he was lying; he had time after he was shot.  The firing seemed to witness to be

over the road from witness's house, and in the lot where deceased was lying. The ramrod was indented on one side as though it had been bruised in the thimble of the gun in coming out. A person, in traveling the road to Swearengen's, on the upper Tuscaloosa road to Columbus, would not have passed through the lot where the deceased was found.

Mrs. Swearengen testified that she was out in her yard, a mile from Columbus, on upper Tuscaloosa road, between sundown and dark, and saw two gentlemen meet,—defendant and deceased. Deceased was going towards Columbus. Defendant meeting him, they conversed sometime together on their horses. She started towards her house, when a negro called to her to look. She turned round, saw the defendant off his horse, and running round and flourishing his arm, and got on his horse and rode by. Witness heard him say, "I'll be God Almighty God damned, if I don't have your life, at the risk of my own." Witness was alarmed and remained in the yard, and soon saw the negro, who had gone towards Columbus with deceased, after Goodwin, the defendant, had left and gone towards Columbus, returning on horseback at full speed, the dogs and a loose horse following him. Witness is rather deaf and could not hear what passed between defendant and deceased; could not hear them talk at all. The dogs neither attempted to bite nor bark at defendant. After defendant rode off towards Columbus, deceased followed slowly with the negro and dogs.

Mrs. Morris,—she was called by the negro to look, and had not observed the deceased and defendant before. Heard defendant say, as he rode off, "I'll be damned if I don't have his life at the risk of my own." Heard no other remarks. Defendant was not addressing any one when he made these remarks. Heard the guns. The first report was loudest. Her attention was directed to the sound. Anticipating, from what Mrs. S. and the girl had told her, that there would be murder, stood in the door fifteen or twenty minutes listening. This was on 21st March, 1844.

Wm. Lester testified that before he heard the report of the guns, defendant came to his father's lot, in a gallop, on the upper Tuscaloosa road, and inquired if he had seen Ned Abbott, the de-

ceased, pass there; and being told that he had not, went on towards Swearengen's. Shortly afterwards he came back in a gallop, and before he reached him, said, "William, William! Sterling, Sterling! have you got a gun?" Witness told him he had a gun, but neither powder nor shot. Defendant then rode towards Wallace's in a gallop; and soon afterwards, witness heard the report of two guns, and saw a negro on horseback, with the dogs and a loose horse following. Witness went to Mr. G. M. Mullin's, and there found the deceased dead. The report of the gun did not appear to come from the road, but from the open lot where deceased was found. Dr. Liscomb was called by the jury of inquest to make a *post mortem* examination. The wound was in the flank, just above the hip bone, a little anterior thereto; the shot ranging at a little elevation towards the backbone, from the left side; that the clothing was torn, and the wadding of the gun and clothing were forced into the wound. The shot extracted were duck shot. The clothing about the wound were powder burnt. A man might have gone ten steps after receiving such a wound.

Mr. Riddle testified, that he was passing by defendant's house on the evening of the death of deceased; heard him call defendant, though he did not see the latter. Deceased was sitting on his horse at defendant's gate, some one being with him, whom witness took to be a negro. Witness came to town by Major Downing's house, on the Tuscaloosa road; was overtaken by defendant, who, after speaking about some fish witness had, inquired of him if he had seen Ned, or Ned Abbott (deceased.) Defendant was riding fast towards town. Afterwards, when witness got to the edge of the town, he again saw defendant cross the military road in a gallop, going towards Joseph Wallace's. In a few minutes afterwards, witness heard the report of two guns, a few seconds apart, and heard deceased's voice setting on his dogs, and some one riding off towards Lester's, the dogs in pursuit, and horse following. Went to the place whence the gun shot reports came and saw deceased dead. Was about one hundred and fifty yards off when he heard the reports, but could not distinguish between them. C. Frazer confirms the statements of the above witness.

Mr. Wallace testified, that he was with Riddle and Frazer; confirms their statements, and further, that after hearing the defendant coming to his father's gate, with his (witness) gun, defendant called witness, and set the gun down beside the gate. Witness had not used the gun for some time, and did not know that it was loaded. It did not have the ramrod in it then; identified the ramrod spoken of by G. M. Mullin as having been found near the deceased, as the ramrod belonging to his gun, which was a common single-barrel shot gun. Defendant resides two or three miles from town, has a double-barrel shot gun and a pistol which he usually kept at home.

Joseph Wallace testified, that he had loaded the gun some days previous, with middling size shot, (goose or duck shot), and it had not been discharged since. Defendant owned a double-barrel shot gun and one or two pistols. Saw the defendant after the killing of the deceased. Defendant was wounded in the right shoulder with a ball; the ball descended from the shoulder towards the back-bone. Tail of defendant's coat was torn. Eli Abbott is sheriff of Lowndes county. On the 21st March, 1844, appointed deceased special deputy to levy an execution against defendant, endorsed: E. N. Abbott is hereby authorized to levy this *fi. fa.* this 21st March, 1844, E. Abbott, sheriff. [SEAL.] This evidence defendant objected to, but the objection was overruled, and exceptions taken. Witness stated that it is 1150 yards from Mullin's house to Swearengen's; 600 from Lester's to Joseph Wallace's; 400 from Mullin's to Wallace's; had examined the ground where deceased was killed; saw a horse-track across the ditch; that the same negro deceased had in custody when killed, was in custody some twelve months ago, and got away after court. Deceased caught him, and he was afterwards released by the plaintiff in execution. Deceased usually went armed; that he kept dogs to hunt negroes, and white persons, also. He weighed about 145 pounds, and was strong and active. Witness sent deceased to levy on the negro, because the negro knew him, witness, and his other deputies.

Mr. Nell, testified that some twelve months since, defendant took him to his house, told him the negro remained there several days, that he had taken him away from the state, to avoid the

execution against him ; did not intend to run him off, but only wanted to get a witness who was absent, by whom he could prove the negro was not subject to the execution ; that as soon as that witness returned he intended to deliver the negro again to the sheriff.

Mr. Thomas ; has hunted with defendant several times, and he always shot left-handed, when he saw him shoot.

Mr. Moore testified, was present when the ball was taken out of defendant's back ; when Dr. Winter attempted to probe the wound, the probe not entering readily, defendant said, " let me raise my arm, doctor ; it was raised when I was shot."

Doctor Wharton, first witness on the part of the defence, stated that the dogs had pursued the defendant and himself, on one occasion, when they had to get on a fence ; the defendant appeared to be agitated; that on the arrival of the deceased, the dogs' noticed them no farther. Mr. Leverett and Maxey Hall stated substantially the same thing in relation to themselves.

Mr. Graham, said that on the evening of the killing, and before, one of the dogs caught him by the pantaloons in the street. S. G. Mills also testified to the ferocity of the dogs. Dr. Winter examined the wound on defendant's shoulder, on the evening deceased was killed ; the ball entered his right shoulder near the point and ranged back towards the spine. Probed the wound, took out the ball, which, upon deceased's pistol being shown to him, he, said was of a size about suited to that. Defendant's arm must have been raised when he received the wound. Dr. Smith saw the wound on defendant, and agreed with Dr. Winter in his description of it.

Miss Wallace, (daughter of Joseph Wallace), testified that on the evening deceased was killed, between sundown and dark, defendant came to her father's house and asked for a gun, and a servant handed him her brother's gun. As he turned off she asked defendant, " what he wanted with it ?" He replied, " nothing much ; I only want to shoot a dog," and rode off.

The defendant's counsel asked the court to instruct the jury, " that if they believed from the evidence, that the deceased came to his death by means of the shot aforesaid, and not by one

leaden bullet discharged from said shot gun, as alleged in said
bill of indictment, that they must return a verdict for the pris-
oner of not guilty as charged in the bill of indictment;" the
court refused to give this instruction, but instructed the jury,
"that the said proof was sufficient to sustain the said bill, as
alleged in the indictment." To which opinion of the court,
refusing to give the instruction asked, and in giving the charge
which it did, the defendant's counsel excepted, and filed his sec-
ond bill of exceptions. The verdict was "guilty of manslaughter
in the second degree," and the sentence seven years in the peni-
tentiary.

*Harris & Harrison,* for plaintiff in error.

1. The deceased was not an officer, and all his acts done under
color of office was void. How. & Hutch. Dig.. 292, § 6. Ib.
296, § 22. At common law the sheriff had the right to appoint
both regular and special deputies, and our statute was intended
1st, to *limit* and define to a certain extent, the powers and
duties of the sheriff himself; for at common law, he was a
judge, keeper of the peace, a ministerial officer of the superior
courts and the King's bailiff. 1 Black. Com. 343. 2nd. To
authorize and empower the deputies to do and perform *all* the
several acts and duties injoined upon their principals. Not so in
England. 1 Black. Com. 345. 3rd. The common law did not
prescribe that the appointment should be in writing, etc., this
our statute has done, and declares that, unless it is so done, "all
acts and proceedings done under color of office, shall be abso-
lutely void."

It is contended on the part of the prosecution, that deceased
was not a deputy sheriff; but was deputed to do a particular
act only; and that said section 6, has no application to such a
case. But it is insisted that the two sections are not only parts
of the same statute, but that the second clause referred to,
makes direct mention of the first, and dispenses only with part
of its requirements, that the latter clause is a mere limitation of
the former one; and that both classes are spoken of as deputy
sheriffs, that when it is enacted that "no person who shall be
deputed to do a particular act only, shall be required to take the
oath directed by the act to be taken by deputy sheriff," it is

declaring *in totidem verbis*, that the other directions and requirements of the statute, are to be complied with; that the express exclusion of one by direct terms, is a direct inclusion of the other. See Welsh v. Jamison, 1 How., 160; Montgomery v. Scanland, 2 Yerger, 337.

2nd. The mortal wound is alleged to have been given with a gun loaded with powder and *one leaden bullet.* The proof was, that it was loaded with powder and a *great number of small shot.*

" If it be alleged that the gun was loaded with powder and a leaden bullet, it must be proved to have been loaded with a bullet, otherwise the defendant must be acquitted. Rex v. Hughes, 5 C. & P. 126; Archb. on Indict. 422 (4th Amer. ed., 1840;) see title Murder; Ib. 382, 383; 24 Eng. Com. Law Rep., 241; Rosc. Crim. Ed. 651. As to the necessity of the proofs corresponding strictly with allegations in the indictment, see Rex v. Thompson, 1 Mood. C. C., 139; Archb. on Indictment, 382; Rex v. Kelly, 1 Mood. C. C. 113; Arch. on Indict. 383. See the form in Archbold, 421, 422.

*John D. Freeman,* attorney general.

Contended that the facts shown by the record clearly proved a regular finding and return into court of the indictment by the grand jury of Lowndes county, against the defendant for murder.

With regard to the venue, several witnesses state, that the offense was committed near Columbus; that deceased was deputy sheriff of Lowndes county, and was in the act of executing a *fi. fa.* on defendant's slave at the time the killing occurred. There is but one Columbus in this state, and the court judicially knew that, that Columbus is the seat of justice of Lowndes county. Kelly v. The State, 3 S. & M., 518. The bill of exceptions does not pretend to give all the evidence in the case, this court will therefore presume that the venue was fully proven.

4th. The point made for the defense, that the deceased was not a deputy sheriff, is not sustained by the facts. The fact clearly appears, that deceased was appointed a special deputy to do a particular act, the appointment being endorsed in the process he was appointed to execute.

5th. There was no error in the refusal of the court to give the charge asked on behalf of the accused, nor in the charge actually given by the court.   Arch. Crim. Pl. 382.   See also, Gill Ev., 231; 9 Co. 67, a; 2 Hale, 115, 185; 2 Hawk. C. 23, sec. 84.

*William Yerger*, in reply.

1. The record does not show that the indictment, upon which the defendant was tried, was found by the grand jury.   The record of the court should show that the indictment was found by the grand jury.   This point has been expressly adjudicated in Tennessee.   Chappel v. The State, 8 Yerger, 166.

2. There is no prosecutor marked on the indictment.   This court has decided this to be error, for which the judgment must be reversed.   Cody v. The State, 1 Howard.

3. The venue is not sufficiently proven.   There is no evidence that the offense was committed in Lowndes county.

4. The court erred in permitting the testimony of Eli Abbott in relation to the appointment of deceased as deputy sheriff, to be given to the jury.

5. The evidence did not justify the conviction.   It is impossible to say from the evidence, whether the defendant killed in self-defence, or not; it is all vague, indefinite and uncertain.

6. The court erred in charging the jury that the " proof given before them sustained the indictment."   It was a charge upon the force of the facts, the weight of the evidence, and an attempt to form for the jury, conclusions which it was their special province to form for themselves.

7. It was error to permit the execution against plaintiff, in favor of Saltonstall, to be read to the jury.   Nothing but the judgment should have been read.

THACHER, J. :

This was an indictment for murder, preferred against the plaintiff in error, in the circuit court of Lowndes county, which, upon trial, resulted in a verdict of manslaughter in the second degree.

The first ground of error taken is, that the record does not show that the indictment in this case was found by the

grand jury.   The record states, that " on the 3d day of April, 1844, the following entry was made upon the minutes of said court, to wit: The grand jurors returned into court an indictment against William S. Goodwin, endorsed thereon a true bill, William M. C. Mirus, foreman of the grand jury, and retired to consider of further presentments.   Said indictment is in the words and figures as follows, to wit," etc.   These words show that an indictment was returned in court by the grand jury, which shows that the accused had been indicted in due form by the grand jury.   This entry is in the usual form, with the omission of the character of the offense charged in the indictment. This is always in general terms, as " for murder, for larceny," etc., and does not further particularize the offense, and is not important.   An indictment is no part of the minutes of the court. The clerk, in making up the record, of which the minutes and the indictment both form parts, must necessarily connect them together in the order of their occurrence in the court below.   It appears from the record that an indictment, therein recited, was returned into court on the 3d day of April, 1844, against the accused ; the record further states that " on the said 3d day of April the following entry was made upon the minutes of said court, to wit : this day came, as well Henry Gray, Esq., the district attorney, who prosecutes in behalf of the state, as the said William S. Goodwyn, who was led to the bar in the custody of the sheriff of Lowndes county, and being arraigned upon the indictment in this case, upon his arraignment pleads not guilty," etc. ; it also further appears in the record, that on the same day a *venire facias* was ordered to summon jurors to serve on the trial of said William S. Goodwin, indicted for murder.   It is a rule well settled that, if there be an uncertainty in any part of a record, it may be explained by any other part of the record.   If it really be error in the first entry of the minutes not to state the character of the offense charged in the indictment, the subsequent entries in the minutes, on the same day, in the same case, and in reference to the same indictment, are too explicit to leave any doubt upon the minds of this court upon this point.

The only other technical objection which we deem requires

comment, is that which has reference to the instruction given by the court below to the jury. It was in evidence, that the deceased came to his death by means of a discharge, by the accused, of a shot-gun, loaded with shot, between the size of squirrel-shot and small sized buck-shot, commonly known as duck-shot. Upon this evidence, the court was desired to charge the jury, " that, if they believed from the evidence, that the deceased came to his death by means of the shot aforesaid, and not by one leaden bullet discharged from said shot-gun, as alleged in the bill of indictment, they must find a verdict for the accused." This charge the court refused, but charged the jury " that the said proof was sufficient to sustain the said bill as alleged in the indictment." The charge requested was clearly, properly refused. The instrument by which the death is caused need not necessarily be strictly proved as laid in the indictment, and proof of its having been caused by any other instrument capable of producing death in a similar mode, satisfies the indictment in that respect. The charge given by the court was but the negative of the charge requested. The language of the court, referring to " the said proof," refers solely to the proof of the contents of the shot-gun, and its language, when declaring the said proof " sufficient to sustain the said bill, as alleged in the indictment," refers to the allegation in the indictment of the contents of the shot-gun. It was not, in our view, intended as a charge generally upon the evidence in the case, and from the finding of the jury could not so have been understood by them.

There is nothing in the circumstances attending the commission of the fatal act by the accused, as they are to us presented, that seems to warrant us to interfere with the judgment. The accused parted from the deceased before the event, with a deadly threat against some one, shortly returned to him armed, and an affray ensued, in which he shot the deceased. The evidence shows an inducing cause for excited, but inexcusable feelings of passion in the arrest of his property, in execution by the deceased, in his capacity as deputy sheriff, a threat, and finally an act of violence, that resulted in the death of that officer by the hand of the accused. The chain of evidence links the circum-

stances so together, that it is impossible for the mind to separate them, or to divert them of the stain of guilt. We are disposed to adopt the more mild interpretation of the jury, which mitigated the offense into a lesser degree of crime than the one charged in the indictment, but we find ourselves, after an anxious investigation of all the facts, unable to behold them in any other light.

The judgment of the circuit court of Lowndes county is therefore affirmed.